### WILEY v. MEARS et al.

#### Patent Appeal No. 3387.

Court of Customs and Patent Appeals.

Feb. 25, 1935.

James H. Littlehales, of Washington, D. C. (Williams, Bradbury, McCaleb & Hinkle and Benjamin F. Wupper, all of Chicago, Ill., of counsel), for appellant.

Donald M. Carter, of Chicago, Ill. (Parker & Carter, of Chicago, Ill., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This is an interference proceeding in which the party Wiley has appealed to this court from a decision of the Board of Appeals of the United States Patent Office awarding priority to the parties Mears and Hynes upon six counts of the interference, numbered, respectively, 1 to 6.

The subject-matter of the issue relates to hood latches for automotive vehicles.

The interference was declared between a patent, No. 1,809,720, issued to appellees June 9, 1931, upon their application, serial No. 361,933, filed May 10, 1929, and an application of appellant, serial No. 560,278, filed August 31, 1931, in which appellant copied claims from the said patent to appellees, alleging that he had disclosed, though he had not claimed, their subject-matter in a prior patent, No. 1,781,261, issued to him November 11, 1930, upon an application, serial No. 276,769, filed May 10, 1928.

Under such circumstances the party Wiley is required to prove priority beyond a reasonable doubt. Alfred B. Seppmann v. John J. Roden et al., 46 F.(2d) 186, 18 C. C. P. A. (Patents) 831; Sharer v. McHenry, 19 App. D. C. 158; French v. Halcomb, 26 App. D. C. 307.

The interference was declared October 16, 1931; seven counts being therein involved. The Examiner of Interferences held Wiley entitled to the benefit of his earlier patent, and also held that he was entitled to prevail upon the testimony as to all seven counts.

The Board of Appeals held that the Wiley patent supports count 7 only, and that appellees are entitled upon the "testimonial record" to prevail as to the other counts. No appeal was taken from the board's decision as to count 7, awarded to Wiley.

The counts involved read as follows:

"1. A latching device for an automobile hood, adapted to draw the lower edge of a double hinged hood closure downwardly and inwardly in rattle preventing engagement with the opposed portions of the automobile, which includes a rock shaft mounted on the inner face of the closure for rotation about a generally horizontal axis, cranks associated with said rock shaft, cam members positioned within said closure for engagement with said cranks, and means for rotating said cranks into camming locking engagement with the cam members, said cranks being adapted, in cooperation with said cam members, automatically to compensate for variations in shape and position of parts affecting the contact between cranks and cam members, and being adapted, in response to their engagement with the cam members, to draw the lower edge of the hood closure downwardly and inwardly against the opposed portions of the automobile, said cranks engaging said cam members at all times, in all normal adjustments, at a point intermediate the extension of the cam portions of said cam members.

"2. A latching device for an automobile hood, adapted to draw the lower edge of a double hinged hood closure downwardly and inwardly in rattle preventing engagement with the opposed portions of the automobile, which includes a rock shaft mounted on the inner face of the closure for rotation about a generally horizontal axis, cranks associated with said rock shaft, cam members positioned within said closure for engagement with said cranks, and

means for rotating said cranks into camming locking engagement with the cam members, said cranks being adapted, in cooperation with said cam members, automatically to compensate for variations in shape and position of parts affecting the contact between cranks and cam members, and being adapted, in response to their engagement with the cam members, to draw the lower edge of the hood closure downwardly and inwardly against the opposed portions of the automobile, said cranks engaging said cam members at all times, in all normal adjustments, at a point intermediate the extension of the cam portions of said cam members, the means for rotating the rock shaft and cranks including a handle shaft rotatably mounted on the closure, its axis of rotation being substantially at right angles to the axis of rotation of the rock shaft, an exterior handle therefor, and an actuating connection between said handle shaft and the rock shaft, adapted to rotate the rock shaft in response to rotation of the handle, said actuating connection including a crank on the handle shaft, a crank on the rock shaft, and means for maintaining them in actuating relationship.

"3. A latching device for an automobile hood, adapted to draw the lower edge of a double hinged hood closure downwardly and inwardly in rattle preventing engagement with the opposed portions of the automobile, which includes a rock shaft mounted on the inner face of the closure for rotation about a generally horizontal axis, cranks associated with said rock shaft, abutment members positioned within said closure for engagement with said cranks, and means for rotating said cranks into camming locking engagement with the abutment members, said cranks being adapted, in camming cooperation with said abutment members, automatically to compensate for variations in shape and position of parts affecting the contact between cranks and abutment members, and being adapted, in response to their engagement with the abutment members, to draw the lower edge of the hood closure downwardly and inwardly against the opposed portions of the automobile, said cranks engaging said abutment members at all times, in all normal adjustments, in a slidable relationship.

"4. A latching device for an automobile hood, adapted to draw the lower edge of a double hinged closure downwardly and inwardly in rattle preventing engagement with the opposed portions of the automobile, which includes a yieldingly torsionally distortable rock shaft mounted on the inner face of the closure for rotation about a generally horizontal axis, cranks associated with said rock shaft, abutment members positioned within said closure for engagement with said cranks, and means for rotating said shaft and cranks into camming locking engagement with the abutment members, said cranks and shaft being adapted, in cooperation with said abutment members, automatically to compensate for variations in shape and position of parts affecting the contact between cranks and abutment members, and being adapted, in response to their engagement with the abutment members, to draw the lower edge of the hood closure downwardly and inwardly against the opposed portions of the automobile, said cranks being adapted slidably to engage said abutment members at all times, in all normal adjustments.

"5. In a latching device for an automobile hood, adapted to draw the lower edge of a double hinged hood closure downwardly and inwardly against opposed portions of the automobile, a rock shaft mounted on the inner face of the closure for rotation about a generally horizontal axis, a base plate on which said shaft is rotatably mounted, cranks associated with said rock shaft, cam members, positioned within said closure, adapted for variable contact engagement with said cranks, said cranks being adapted, in response to rotation of the shaft and their engagement with the cam members, to draw the lower edge of the hood closure downwardly and inwardly against the opposed portions of the automobile, and means for rotating the rock shaft, including a handle shaft mounted upon said base plate for rotation about an axis generally at right angles to the axis of rotation of the rock shaft, an exterior handle, and an actuating connection between said handle shaft and the rock shaft, and limit means, associated with said base plate, for positively limiting the arc of rotation of the handle shaft.

"6. A latching device for an automobile hood, adapted to draw the lower edge of a double hinged hood closure downwardly and inwardly in rattle preventing engagement with the opposed portions of the automobile, which includes a rock shaft mounted on the inner face of the closure for rotation about a generally horizontal axis, cranks associated with said rock shaft, cam members positioned within said closure for engagement with said cranks, and

means for rotating said cranks into camming locking engagement with the cam members, said cranks being adapted, in cooperation with said cam members, automatically to compensate for variations in shape and position of parts affecting the contact between cranks and cam members, and being adapted, in response to their engagement with the cam members, to draw the lower edge of the hood closure downwardly and inwardly against the opposed portions of the automobile, said cranks engaging said cam members at all times, in all normal adjustments, at a point intermediate the extension of the cam portions of said cam members, the means for rotating the rock shaft and cranks including a handle shaft rotatably mounted on the closure, its axis of rotation being substantially at right angles to the axis of rotation of the rock shaft, an exterior handle therefor, an actuating connection between said handle shaft and the rock shaft, adapted to rotate the rock shaft in response to rotation of the handle, and means for limiting the rotation of the handle shaft to an arc of 180°."

The type of automobile latch involved seems to have been a development responsive to the introduction of streamlined automobiles, and was designed to supplant that type of hood latches which was placed on the outside of the hood and which had hollow tubular members or "barrels" with springs therein that were held under tension when the latch was fastened, thus pulling the hood down and holding it in position upon the chassis or frame of the vehicle.

Neither the application nor the patent here at issue is generic with respect to the rock shaft type of latch, prior patents having been issued which cover the broad idea. That which is here involved, as the counts were construed by the Board of Appeals, is a structure which requires "such coaction between the members designated the cam members and the cranks at the ends of the rock shaft as to cause the cranks to engage said cam members at all times in all normal adjustments at a point intermediate the extension of the cam portions of said cam members." This limitation the board held to be included by definite expressions in counts 1, 2, 3, 4, and 6, supra, and it was held to be also present, as a limitation, in the somewhat broader expression of count 5, supra, which reads: " * * ` cranks associated with said rock shaft, cam members, positioned within said closure, adapt-

ed for variable contact engagement. with said cranks * * *."

In their preliminary statement appellees claimed January 2, 1929, for conception and explanation of the invention to others; March 2, 1929, for the making of first drawings; March 15, 1929, for the completion of a "full sized machine"; and April 15, 1929, for successful operation and first written description. Neither tribunal of the Patent Office, under his or its view of the case, found it essential to consider, as to appellees, any dates earlier than their filing date of May 10, 1929.

As a matter of law, if the disclosures of the Wiley application of May 10, 1928, which ripened into his patent of November 11, 1930, support the counts, Wiley is entitled to the award of priority in view of the evidence in the case.

The disclosures, in so far as here pertinent, of the patent to appellees, in which the counts originated, are of a vehicle body with a hinged hood with terminal elements for the ends of the hood attached to the chassis or frame; mounted upon the terminal elements are brackets, or parts, defined in the specification as "locking abutments"; the faces of these locking abutments incline inwardly and upwardly from the hood, the sloping portions being referred to as cam portions; at the upper end of the cam portions there are projections; also mounted within the hood is a rock shaft extending the length of the hood and having its ends in crank formation adapted to engage the inclined faces or cam portions of the locking abutments; a short shaft or bolt passes through the lower edge of the hood, midway thereof, having a handle on its outer end, its inner end being connected through suitable means with the rock shaft.

In operation when the handle outside the hood is turned it causes the rock shaft so to move as that its crank ends slide upon the angular faces or cam portions of the locking abutments, and all the counts were construed by the board to require that, in whatever normal position the hood may be, the crank ends shall engage such locking abutments at a point intermediate their angular faces; that is, as the board describes it, "somewhere along a mid-point of the cam surface."

It is explained in the brief for appellees that the purpose of such arrangement is to provide a structure which will accommodate itself "to the weaving of the parts

as the car moves along the road" and thus "hold the hood from rattling."

The Examiner of Interferences appears to have construed the counts differently and somewhat more broadly, and the different conclusions reached, upon both the technical and factual questions involved, seem to have resulted from these differences in opinion as to the proper construction of the counts.

The pertinent disclosure of the patent to Wiley is a structure having brackets or terminal elements, referred to as "anchorage brackets"; these have angular portions with projecting parts thereabove corresponding generally to the locking abutments described in the Mears and Hynes patent, but the Board of Appeals holds that in the Wiley patent when the hood is in normally closed position, the crank ends lie in the angles of the brackets, whereas under its construction of the counts they require that such ends shall rest intermediate the ends of the angular portions.

Careful consideration of the several counts leads us to the conclusion that the board's construction of counts 1, 2, and 6 is correct. Each of these has an express limitation that the crank ends shall engage the *cam* members at all times in all normal adjustments, at an intermediate point of such cam members.

We also agree with the board's conclusion that Wiley's patent does not support these counts. To quote from the board's decision: "We find no suggestion in the prior Wiley patent that the crank arm is intended to normally rest upon the surface of the inclined cam bracket E at all times when in normal closed position or adjustment."

■ As to counts 3, 4, and 5, supra, however, our conclusion is different.

It is pointed out by the Examiner of Interferences that neither of these counts is "limited to a *camming* engagement of the crank ends with the *camming portion* of the abutments at all times." (Italics ours.)

Counts 3 and 4, supra, merely require, upon this feature, that the crank ends shall engage the *abutment members* at all times, in all normal adjustments, "in a *slideable relationship*," while count 5, supra, merely requires, as to the here pertinent elements, that the cam members shall be "adapted for *variable contact* engagement with said cranks." (Italics ours.)

Nothing in count 5, supra, requires that such variable contact adaptation shall be effective "at all times" and "in all normal adjustments." It is a broad claim and seems to us to be clearly supported by the Wiley patent under any normal construction of the count.

It is assumed by us that all the counts were construed by the board in the light of the disclosure of the Mears and Hynes patent in which they originated, and that, under the situation here existing, it was felt by it that the usual rule of giving to the counts the broadest interpretation of which they are reasonably capable is not applicable.

It seems to us, however, that even under the rule of construction, which we assume to have been followed, counts 3, 4, and 5, supra, may not properly be held to be excluded from the Wiley disclosure. The Examiner of Interferences points out that, "The Mears and Hynes patent does not state that there is sliding movement," and directs attention to the fact that the "counts were not in the Mears and Hynes application when it was filed but were added by amendment."

Since counts 3 and 4, supra, do not require sliding or intermediate contact with the *camming* surfaces at all times, in all normal adjustments, but are met by a contact in slidable relationship with *any part* of the locking abutments, as, for example, with the horizontal portions as well as with the angular portions thereof, we can see no reason for holding that the pertinent feature in them is not as clearly disclosed in the Wiley patent as it is in the patent to Mears and Hynes.

Since, as has been already indicated, there is no question respecting the right of Wiley to an award of priority, in view of the testimony, upon the subject-matter of any of the counts disclosed in his earlier application, it follows that he is entitled to such award as to counts 3, 4, and 5.

As to counts 1, 2, and 6, however, the subject-matter of which is found not to have been disclosed in Wiley's earlier application, determination of the question of priority is dependent solely upon the testimonial record.

One of Wiley's claims is that Mears and Hynes were not the original inventors but that they derived the invention from Wiley, and another is that Wiley reduced the invention to practice prior to any date of invention claimed by Mears and Hynes.

No extended discussion of the testimony seems to us to be necessary. We are confident that there is no merit to Wiley's contention relative to the invention being derived from him, and although the Examiner of Interferences and the Board of Appeals reached different conclusions relative to the date that should be awarded Wiley for reduction to practice, these differences grew out of the differences in their construction of the counts, and not out of any divergence of view as to the weight of the evidence or the construction thereof.

The Examiner of Interferences expressly held that, as to any of the counts which upon appeal might be found unsupported by Wiley's patent disclosure, no date could be awarded him, upon the evidence, for a reduction to practice earlier than the filing date of Mears and Hynes. So, the only point of disagreement upon the facts related to the finding bearing upon Wiley's disclosure in his patent.

Our examination of the testimony satisfies us that the finding based thereon, which is concurred in by both tribunals of the Patent Office, was correct as to counts 1, 2, and 6.

Other incidental questions were presented in argument, but all that are actually involved in the reasons for appeal have been here met and decided. The decisions of the tribunals of the Patent Office contain ample discussions of the testimony and of such incidental questions as arose therefrom, and no good purpose could be served by reproducing or paraphrasing such decisions here.

The decision of the Board of Appeals is modified, being affirmed as to counts 1, 2, and 6, and reversed as to counts 3, 4, and 5.